UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/22/21

UNITED STATES OF AMERICA,

    -against-

WILLIAM MURRELL,

        Defendant.

_____x

20 CR 353 (CM)

DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

McMahon, D.J.:

William Murrell is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); three counts of possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841; and one count of possession of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Before the Court is Murrell's motion to suppress the physical evidence seized by the police at the time of his arrest. In his affidavit in support of his motion, Murrell says that he was hanging out on a street corner speaking with friends when, for no reason, the police seized and searched his person. (*See* Murrell Affidavit ¶¶ 3-11). Murrell's allegation contradicts the Government's version of events, as set forth in the criminal complaint, that the seizure was wholly lawful. (ECF Docket No. 1).

On March 30, 2021, the Court held a hearing to resolve the disputed issues of fact, and to allow the Government to defend the lawfulness of the officer's actions. *See United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (The Government bears the burden of proof as to establishing probable cause.).

Murrell's motion to suppress is DENIED.

1

### The Court's Findings of Fact After Hearing

The court listened to testimony from two New York City police officers who arrested Murrell—Imra Alli and Sandy Nunez—and looked extensively at video from a local surveillance camera and from the two officers' "body cams." Murrell relied on the affidavit he submitted in connection with his motion, which testimony was not cross-examined, as he did not assume the witness stand.

GX 3 is video captured from a surveillance camera located on East 161st Street between Courtlandt and Melrose Avenues, starting at 12:00 midnight (erroneously marked 1:00 a.m., on the camera's counter; I will use the time markings on the video, but the reader should be aware that these events happened one hour earlier, as all parties concede). The camera, located on the south side of East 161 St., is pointed east, toward Melrose Avenue; the intersection of East 161 and Melrose can be clearly seen, as the street lighting is excellent, despite the late hour. There is no audio track on GX 3, only video.

GX 4 is video captured from Alli's body camera.

GX 10 and 11 is video captured from Nunez's body camera: GX 10 at the scene of the arrest, and in the car on the way back to the 42nd PCT; and GX 11 at the Sergeant's desk where defendant was subjected to an inventory search, and then in the arrest processing area adjacent thereto.

All of the body cams have both video and audio tracks.

The following represents the court's conclusion about what occurred; the evidence cited, unless otherwise indicated, is what the court found to be credible.

2

### *The Encounter*

All citations to video evidence in this section are to GX 3. At no point during what I refer to as "the encounter" did either officer have his body camera turned on.

On November 19, 2019, at 12:09 a.m. (1:09:40 on the counter on GX 3), defendant William Murrell—wearing a heavy black coat lined in fur, and a red, white and blue, patched-baseball cap, worn backward—walked into the range of the surveillance camera. He proceeded west along the south side of East 161st Street, heading toward Courtlandt Avenue. Murrell stopped near the entrance to the Gourmet Deli, which, per GX 1 and 2, lies just east of the steps that mark the entrance to The Savoy— an apartment building that was known to the police as a drug-ridden building in this high crime neighborhood. (Tr. 16, 17, 20, 134).

When Murrrell stopped, he was approached by a taller man (henceforth known as "Tall Guy," or "TG"), who emerged from the area just east of the Savoy stairs, where the deli is located. (GX 3 12:09:58) The two men engaged in conversation. A third individual ("Third Man"), standing on the street corner facing the two men, appears to be listening to the discussion. Murrell was smoking a cigarette; he was wearing a backpack, and that the backpack appeared to be heavy.

At approximately 1:10:20 on the counter (12:10 a.m. real time), TG began touching Murrell; he can clearly be seen patting several areas of the defendant's body, including his coat pockets on both sides. It appeared to this viewer that TG was conducting a "pat down" of Murrell. Following this "pat down," their conversation continued. TG became quite animated, flailing his arms, and walking away from defendant and then back again.

A few seconds after the "pat down," (1:10:50 or so on the counter), TG began walking backward up the steps of The Savoy. At that moment, an aging black Chevy Impala, with what

3

looks like it might be a decal on the passenger side door, drove into view from the west. The Impala occupied the northernmost eastbound lane (the center lane) on 161st Street.[1] The car stopped in the painted median across from The Savoy; there were three lanes of East 161St Street and a portion of the sidewalk on the south side of the street between the Impala and the three men.

The car and its occupants were part of an anti-crime patrol; the car was being driven by P.O. Nunez, while P.O. Alli occupied the passenger seat. (Tr. 6-7). As the court is aware from many prior hearings in many prior cases, the NYPD unit formerly known as the Anti-Crime Unit (now referred to as the Public Safety Unit, Tr. 5) is a plain clothes unit that patrols high crime neighborhoods looking for suspicious activity. (Tr. 63-65). Anticrime officers are not "undercover;" they wear bulletproof vests, gun belts with firearms and shields, and carry police radios, which are always on and broadcasting "chatter." (Tr. 28). But anti-crime officers do not drive in marked police cars or wear uniforms. Instead, they try to blend into the community while on patrol. (Tr. 6-7).

Officer Alli had placed a decal for a local taxi service, GX 13, on the passenger door of the car for the purpose of disguising the fact that the Impala was a police vehicle. (Tr. 12). The car was, however, equipped with special police equipment– strobe lights over the dashboard (which the court referred to as looking "like a shower head that's coming down from the roof of the car," (Tr. 9)); a computer where a taxi meter might be mounted; and a printer located between the driver's seat and the front passenger seat (Tr. 7-9). These unusual items would have

---

[1] At that point, East 161st Street had three eastbound lanes; with cars parked in the lane closest to the curb on the south side of the street. A yellow striped painted "median" was just to the north of the center lane. There appear to be two westbound lanes beyond the median.

4

been visible to anyone who was standing next to the car and looking through an open window. (*See* GX 13).

TG was not fooled by the officers' efforts to "blend in." Alli opened his window and called out, "How's your night going? What are you guys doing? What are you up to?" (Tr. 21). TG responded from the steps, and then moved toward the curb. There is, of course, no audio on the surveillance tape, but according to Alli, TG "screamed" back at his interlocutor, saying, "Hey, officer, we don't have any guns or drugs on us!" Alli's testimony is credible; GX 3 shows TG pulling up his shirt and displaying the area around his waist, as if to show the person to whom he was speaking that he was not hiding anything on his person. (GX 3, 1:11:15 on the counter). It seems obvious that TG knew he was talking to the police.

Throughout this exchange, defendant was standing no more than a foot or two from TG (depending on the latter's position as he moved around). Alli testified that TG was speaking loudly; this testimony is credible, given the distance between TG and the car and TG's obvious volubility, as demonstrated by his body language. There is no way that defendant could have failed to hear the exchange between Alli and TG.

After TG pulled up his shirt, the Impala began to move forward (eastbound). Meanwhile, defendant, still smoking, turned to his left and began to walk west on East 161st Street, away from the encounter with the police.

As soon as Murrell began to walk away (1:11:23 on the GX 3 counter) the Impala started backing up; the car pulled into the traffic lanes as it came to the spot where defendant was walking, then continued backing westbound (out of the frame). The purpose of this maneuver was to "engage" Mr. Murrell. Alli testified that he could see that Murrell's right coat pocket was hanging more heavily than his left pocket (Tr. 25) and that, "You could see a bulge in that

5

pocket, something longer, an object protruding toward the bottom part of the pocket." (Tr. 26). Whatever Alli said he could see is not visible to the viewer of GX 3.

When the Impala backed up, defendant hesitated for a moment. He then walked toward the curb. When the Impala reappeared and pulled alongside defendant (1:11:36 on the counter), Defendant stepped off the curb and walked up to the Impala, stopping no more than a foot from the passenger side door of the car. The window was down; Murrell had to be able to see into the front seat of the car.

Murrell's coat was open, and he happened to be wearing quite a bit of jewelry; he had many necklaces and chains and a cross around his neck. Nunez made note of this when he first saw Murrell, and again when Murrell was standing by the car, Nunez asked Murrell about all that jewelry, and told defendant that he should be careful and stay safe, as the area was known for robberies. (Tr. 27, 109). Murrell responded that he lived in the area; he pointed east down 161St Street. (Tr. 27). Alli's testimony in this regard is again corroborated by the surveillance video, which shows defendant pointing east. (GX 3, 1:11:42 on the counter and again at 1:12:00 on the counter). Murrell told Alli that he was going home– a suspicious statement, in that he was walking west, not east, the direction in which he had pointed.

Wishing to converse with defendant further, the two officers opened their respective car doors and emerged. (GX 3 at 1:12:18 on the counter). Murrell immediately began to run.

### The Chase

Murrell began running eastbound on East 161 Street and turned south on Melrose, cutting through a gas station on the southeast corner of East 161 and Melrose. (Tr. 29). The officers got quickly back into their car and began to pursue defendant.

6

Nunez drove east on East 161st, then turned right and went south on Melrose. Both officers testified that they could see the right side of defendant's coat hanging lower than the left side as he ran down East 161st Street. Alli further testified that Murrell's arm was "tucked toward the side of his jacket where his pocket is located" (Tr.30); while Nunez said that the defendant "took off grabbing his lower side jacket pocket." (Tr. 109)

The court has viewed this portion of GX 3, dozens of times; I could see none of this. I did not see that the jacket was dragging down on the right side. Neither did I see the defendant's arm plastered against his right side; space is clearly visible between the defendant's arm and his jacket. Nor do I see the defendant grabbing his right pocket as he runs away. I acknowledge that my view was from a different vantage point than the officers had; however, from my perspective, the video does not corroborate their testimony. Fortunately, any discrepancy between what the officers testified and what the court saw on the surveillance video ends up not being relevant to, let alone dispositive of, the decision on this motion.

At 1:12:08 on the counter—which is to say, before defendant started running—TG and what appears to be Third Man emerged from behind the steps of The Savoy. This suggests that the two men had ducked into the deli after the encounter between TG and the officers. (Tr. 36). They walked east toward Melrose Avenue, reaching the corner at about the time the Impala turned south onto Melrose. The passenger side window of the Impala was still open; Alli testified that TG shouted, "He has a gun," as the car made the turn. (Tr. 36, 88). Nunez also testified that TG yelled, "He's got a gun" at this point. (Tr. 111).

While the two officers agreed about TG's shouting that Murrell had a gun, they gave wildly divergent testimony about the rest of the car chase. Had either officer had his body cam turned on, the film would be dispositive, but Alli did not turn on his body cam until later in the

7

chase, while Nunez did not start his until after Murrell was caught and subdued. However, footage from Alli's body camera (GX 4) showing that the two officers drove toward the gas station from the south (i.e., while driving north on Melrose) (GX 4 at counter 13:21) suggests that Alli's version of the car chase more accurate: The Impala went one block south on Melrose, turned right onto East 160th Street, then doubled back when defendant, who was running westbound, turned around and started back east and then north on Melrose. (Tr. 36-41)

As they approached the gas station, Alli told Nunez to "cut him off." (GX 4 at counter 13:21).2 Nunez drove into the entrance to the gas station (Tr. 42), where Alli got out of the car and pursued the defendant south on Melrose (Tr. 112, 132). Alli testified that TG again shouted, "He has a gun;" during the foot chase. (Tr. 50). The court has listened extensively to the body cam recording, but I cannot make out those words.

### The Search

As Alli caught up to Murrell, he told him, "Stop right there," (GX 4 at 13:34 on the counter), and took him down to the street, saying, "What the f--- are you doing? What are you doing, bro? What are you doing?" At GX 4, 13:44 on the counter, defendant was on the ground and had his hands above his head, but was not cuffed or otherwise restrained. Alli turned him over onto his stomach and starting patting Murrell down very thoroughly indeed. I have no doubt that Alli was looking specifically for a gun, because, at 13:54 on the GX 4 counter—just ten seconds into the pat down—Nunez can be heard (though not seen) saying, "He mighta threw it, he mighta threw it." This indicates to the court that the two officers shared a common belief that Murrell had a gun. In fact, Nunez testified that, while Alli was chasing defendant, he (Nunez)

---

2 As noted above, the body cams have an audio as well as a video component.

was looking for the gun on the assumption that defendant had discarded it— a maneuver that, in his experience (and in the court's) is not uncommon. (Tr. 113).

Alli testified that he thought Murrell had a gun, both because of the "bulge" and "especially because the gentleman just shouted that he had a gun." (Tr. 53). However, even though both Alli and Nunez thought that something heavy was weighing down Murrell's right jacket pocket, Alli did not immediately start his pat down in that area. Instead, Alli used a technique that he testified he ordinarily used: from the inside to the outside, first the left side, then the right side: "A lot of people tend to keep firearms and weapons closest to their bodies. Sometimes they have it on the outermost part of their bodies, like their coats or jackets. I search usually closer to the body. Then I work my way out just to make sure there's no weapons tucked in anywhere." (Tr. 42-43). Nunez can be heard in the background, saying, "Search him good, search him good."

The pat down was slow and methodical; it included a pat down of defendant's waistband. (GX 4 at 15:00 on the counter). It is clear from GX 4 that Alli did not unzip any compartments in defendant's pants;[3] his backpack also was not searched on Melrose Avenue.

At 15:30 on the GX 4 counter, Alli can be heard saying, "I put your phone right there." At that point, Alli had been patting down defendant's upper torso for almost two minutes but had yet to find a gun.

In the last place Alli patted down—defendant' right coat pocket, which was located on the outside and on the second side searched—Alli found the gun that is the subject of the motion to suppress. Alli pulled out the gun, which is clearly visible at GX 4 at 15:44 on the counter, put it on the ground, and stepped on it while saying, "Got anything on you that you shouldn't have?"

---

3 Murrell's pants had a number of zippered compartments, which can be clearly seen on GX 11; they were searched at the precinct, not at the scene.

9

(GX 4 at counter 15:48). Defendant did not respond to that question. The pat down ended with the recovery of the gun.

Alli and another (female) officer cuffed Murrell and lifted him to his feet. (GX 4 at 16:06). Alli walked his prisoner across Melrose to the Impala and loaded Murrell into the back seat of the car. (GX 4 at counter 18:20). Nunez remained with the female officer on the east side of Melrose, at the spot where Murrell had been taken down. Nunez can be heard saying something like, "In the car, crazy, man, forward, back" (GX 10 at 20:12). While there is no context for that statement, it is consistent with Alli's description of the chase that had just occurred.

### *Leaving the Scene for the Precinct*

Once Murrell was in the back of the Impala, TG made a final appearance. On Alli's body cam video, a voice coming from outside the car can be heard in the background (GX 4 at 20:09); Alli identified that voice as TG's (Tr. 56). I could not understand what he said; Alli told him to "take a walk." (GX 4 at 20:21). Murrell then yelled out of the car that he was going to "shoot your ass." (GX 4 20:24; Tr. 56). Alli advised Murrell that he was being recorded, to which defendant responded that he did not care, because he was probably going to do seven years. (GX 4 at 20:32). Alli asked Murrell if the men he had been talking to were his homeboys;" Murrell said they were not, "I'm out here by myself." (GX 4 at 20:53; Tr. 56).

By the time Nunez arrived back at the Impala and got into the driver's seat (GX 10 at 21:55), Murrell was saying, "I don't want to talk, I don't know anything." Nunez responded, "We'll talk later," whereupon defendant repeated, "I don't know anything." Nunez says, "You treat me like a gentleman, I'll treat you like one," and the officers and their prisoner exchanged statements of mutual respect ("just doing your job," . . . "that's all it is bro, respect"). Then

10

Murrell muttered, "That the second time in this precinct, another gun; you must've went on vacation with (unintelligible) my name." Alli asked defendant for his name; thereafter the officers referred to him as "Murrell."

As the car drove toward the precinct, Murrell asked the officers, "What made you all stop me?" (GX 4 at 23:25). One of the officers responded, "I'll tell you, let's get you out of here, we stopped your homies first." When defendant protested, "Not my homie, he asked me a question, I answered, I kept walking,"[4] Nunez said, "He pointed at you, man." (GX 4 at 23:25).

### At the Precinct

When they arrived at the 42nd Precinct, Officers Alli and Nunez escorted Murrell to the sergeant's desk, where he was subjected to an inventory search. This search, conducted under the watchful eye of the Desk Sergeant, was performed by Nunez and the female officer. It led to the recovery of the contents of Murrell's many zippered pockets, including a large wad of cash and a quantity of several types of what appear to be drugs. These and other items were placed on the desk. (See GX 4 and 11).

### DISCUSSION

### The Officers Were Entitled to Engage Murrell in a *Terry* Stop

When the officers drove off in pursuit of the fleeing Murrell, and even when Alli tackled Murrell on Melrose Avenue, they had no evidence that Murrell was committing or had committed a crime, and consequently, no probable cause to arrest him. For the seizure and frisk of Murrell to be constitutional, Alli must have had a reasonable suspicion that

---

[4] That, of course, is not at all consistent with the video, which plainly shows that Murrell was speaking with TG for some time and that TG actually patted him down – behavior consistent with a possible drug deal in the making. Murrell plainly lied to the police when he said that all he did was answer a question and then move on. However, there is no evidence in the record tending to show that the officers saw what was plainly visible to the court on the surveillance video.

11

Murrell might have been engaged in criminality; and he must have conducted the search in which the gun was located based on a reasonable belief that he might be armed and dangerous. *See Terry* v. *Ohio*, 392 U.S. 1, 30–31 (1968).

It is well established that a police officer may conduct a brief "investigative detention" or *"Terry* stop" of a person to investigate possible criminal behavior, if, at the time the officer effects the stop, the officer has "'reasonable suspicion' to believe that criminal activity has occurred or is about to occur." *United States* v. *Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995); *see also Terry* v. *Ohio*, 392 U.S. 1, 30–31 (1968). Reasonable suspicion exists where officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 884 (1975). "To support an accompanying pat down, there must be a reasonable basis to think 'that the person stopped is armed and dangerous.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)).

Although a "hunch" alone does not suffice, *Terry* v. *Ohio*, 392 U.S. 1, 27 (1968), the standard requires "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette* v. *California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States* v. *Sokolow,* 490 U.S. 1, 7 (1989)). When evaluating whether the reasonable suspicion standard has been met, courts "must view the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" *Bailey*, 743 F.3d at 332 (quoting *United States* v. *Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)). This includes considering law enforcement officers' "own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v.*

12

*Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

As for the significance of Murrell's flight from the police as soon as they got out of their car, the Supreme Court has provided clear guidance on how a court should factor flight in a motion to suppress:

> It was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *United States v. Brignoni—Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Florida v. Rodriguez,* 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) *(per curiam); United States v. Sokolow, supra,* at 8–9, 109 S.Ct. 1581. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious \*125 behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

*Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).

Applying these precepts, I conclude that the officers had reasonable suspicion to engage in a *Terry* stop from the following specific, articulable facts that have been found after hearing:

(1)   The place where the police officers encountered Murrell, TG, and Third Man was known to the officers as a high crime area; The Savoy apartment building—where the initial encounter began—was known to the police as a drug-ridden building in this high crime neighborhood.

(2)   An experienced anti-crime police officer who was patrolling in a high crime area could reasonably have believed that Murrell knew the two men in the car were police officers, for two reasons. First, when the officers arrived on the scene and asked the group how their

13

evening was going—exactly the kind of question that police officers ask people who are standing around high crime areas in the middle of the night—Murrell was engaged in conversation with TG. TG's immediate reaction to the question—which Murrell could not help but see and hear—was to say, "We got no drugs or guns" and puledl up his shirt to prove the truth of his statement. Second, when Murrell voluntarily walked up to the Impala, he stood within a foot or two of the car's open passenger-side window, through which anyone could see all the fancy police equipment inside the car— equipment inconsistent with the old "dial car" that the Impala was pretending to be.

(3)     Murrell's immediate and unprovoked flight when the two officers started to get out of the Impala brings this case squarely within the rule of *Wardlow*. The officers had said nothing threatening to Murrell and did not have their weapons drawn as they opened the doors of their car. Murrell's "headlong flight" from individuals he had reason to know were police officers, in the face of conduct that was no more than an effort to engage him in further conversation, was the "consummate act of evasion" that triggered reasonable suspicion and authorized a *Terry* stop under *Wardlow*.

Based on these facts, which are found based on the credible evidence adduced at hearing, I reject Murrell's statement that he thought the two men were getting out of the car to rob him, and I conclude that Officers Alli and Nunez were entitled to engage Murrell in a *Terry* stop.

### The Officers Were Entitled to Pat Down Murrell During the Terry Stop

I further conclude that the officers had reason to believe that Murrell was armed, thereby allowing them to pat him down during the *Terry* stop.

An officer who has a reasonable, articulable suspicion that criminal activity is afoot may conduct an investigatory stop. *Terry v. Ohio*, 392 U.S. at 30–31. "To support an

14

accompanying pat down, there must be a reasonable basis to think 'that the person stopped is armed and dangerous.'" *United States v. Bailey*, 743 F.3d at 332 (quoting *Arizona v. Johnson*, 555 U.S. at 326–27.

The evidence on which the Government principally relied to argue that the officers believed Murrell to be armed was the testimony of Alli and Nunez that they saw a "bulge" in his right coat pocket (the location where the gun was eventually found) and noticed that his right coat pocket was weighted down.  The court questions the reliability of this testimony for three reasons.

First, I have seen and held the gun, which is heavy but quite small; I do not believe that it would have created a visible bulge in the defendant's coat pocket, though I admit it could have weighted the pocket down.

Second, the court has looked extensively at the surveillance video and I cannot see what the officers claim to have seen— though I acknowledge that this could be in part because of camera angles and in part because the court is not trained in the same way officers are trained.

Third, and most important, I find it hard to believe that, if Alli had reason to believe that Murrell had a gun in his right coat pocket, he would not have patted down that area immediately, no matter what Alli's "usual procedure" for a pat down might have been. I cannot believe that someone would have felt compelled to follow a "procedure" that would not get him to the location where he thought a gun might be until the very end of the pat down if he actually had reason to believe that the gun was in Murrell's right front coat pocket.  A reasonable officer, it seems to me, would have gone right to the area where he thought he saw a gun, hoping to disarm the suspect as quickly as possible, rather than to allow him to retain the gun on his person for a full two minutes, during which something untoward could have occurred. This convinces me that

15

when Alli began patting Murrell down, he did not have reason to think the gun was located at any particular place on defendant's person.

However, there is a difference between Alli's having reason to believe that Murrell had a gun and having reason to believe that he had a gun in a particular place. And there is ample credible evidence in the record from which I can conclude that the officers had a reasonable basis to think that Murrell might be armed.

Both officers testified that, as the chase commenced TG—the person with whom Murrell was engaged in conversation when the officers arrived at the scene—yelled to the officers that Murrell had a gun. This testimony is credible, for the following reasons:

(1)     When Murrell asked why he had been stopped, Nunez responded that Murrell's "homie" had "pointed to him." The only thing that this could have referenced were the words allegedly yelled by TG during the chase. There is no evidence that TG said or did anything else to "point" to Murrell. Per the surveillance tape, TG did nothing to draw the officers' attention to Murrell at the time of the original encounter. Neither officer testified that TG said a word about Murrell during that encounter; and nothing on the surveillance tape suggests that TG called attention to Murrell while he was pulling up his shirt and disclaiming possession of guns and drugs. Therefore, Nunez's statement about a "homie" "pointing" to Murrell had to refer to something that occurred during the chase.[5]

(2)     TG was in a position to know whether Murrell had a gun. The court knows this because I saw TG pat down Murrell's right pocket area on the surveillance tape. Of course, the officers did not see this; it occurred shortly before they arrived on the scene. But the significance of TG's having reason to know that Murrell was armed lies not in whether TG was a "reliable

---

[5] It bears noting that Murrell must have thought TG said or did something to finger him; there was no other apparent reason for Murrell to threaten to shoot TG, which he did.

16

informant," but in the credibility that it lends to the officers' testimony that TG said, "He has a gun." I believe that the officers heard those words, as they rounded the corner of East 161st Street onto Melrose Avenue, from the man on the corner— the same man with whom their fleeing suspect had been speaking when they first encountered the pair. The combination of Murrell's unprovoked "headlong flight" from persons he had to know were police officers and this shouted warning could have caused a reasonable police officer to think that Murrell might in fact be armed. This justified Alli's decision to pat defendant down. That he did no more than pat him down (albeit quite thoroughly) is evidenced by the fact that neither defendant's zippered pants pockets nor his backpack was searched at the scene. What the court saw on the body cam video was unquestionably a pat down, not a full search.

### The Stationhouse Search Was an Inventory Search Following a Lawful Arrest

When Alli recovered a gun from Murrell's coat pocket, the officer had probable cause to arrest Murrell, which they did. They transported Murrell to the precinct station house, brought him before the desk sergeant, and conducted a search of his pockets and backpack— neither of which had been examined during the pat down on Melrose Avenue. This was a valid inventory search. *See United States v. Bignon*, 813 F. App'x 34, 37 (2d Cir. 2020).

Accordingly, the recovery of the cash and drugs from Murrell's person—all of which occurred at the station house—did not violate the Fourth Amendment.

The motion to suppress is denied.

This constitutes the decision and order of the Court

April 22, 2021

_____
United States District Judge